IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| JAMES ROBERTS | : | NO. 11-cr-0018 |

MEMORANDUM ORDER

AND NOW, this 28th day of March, 2012, upon consideration of the Defendant's Motion
to Suppress Physical Evidence (Doc. No. 22) and the Government's response thereto (Doc. No.
30), as well as the evidence presented in the associated suppression hearing and the arguments in
the parties' supplemental briefs (Doc. Nos. 45, 46), it is hereby ORDERED that Defendant's
Motion to Suppress (Doc. No. 22) is GRANTED in its entirety.

I.    Introduction

On October 7, 2010, Philadelphia Police Officer Daniel Kostick and his partner pulled-
over a 1994 Dodge Caravan driven by James Roberts, the Defendant in this criminal matter.
According to Officer Kostick, he stopped the vehicle because it had excessively tinted windows.
Kostick subsequently ordered Roberts out of the van for purportedly failing to comply with
Kostick's commands.  As Kostick tells the story, as Roberts was exiting the vehicle, Kostick saw
"drug paraphernalia" in an open driver's side door compartment or "cutout" near the bottom of
the door.  Kostick never wavered with respect to the location of the drugs.  After handcuffing
Roberts and placing him in the patrol car, Kostick returned to the Caravan to recover the drugs.
As he was bending down, Kostick supposedly saw the butt-end of a gun underneath the driver's
seat.  All-in-all, Kostick's warrantless search of Roberts and his van yielded numerous ziplock

packets containing crack and cocaine, a pill bottle, a loaded Glock 26 handgun, and $1,906 in cash.

Two (2) months later, the Federal Government adopted the case.  On December 21, 2010, Drug Enforcement Administration ("DEA") Special Agent Patrick Trainor, relying on information provided by Kostick, sought and obtained a federal arrest warrant for James Roberts. That same day, federal agents arrested Roberts outside his house, near a 1997 green minivan also owned by Roberts.  Roberts signed a "Consent to Search" form for the minivan, and agents searched the vehicle and recovered baggies of crack cocaine from the center console.

The doors of Roberts' 1994 Caravan *have no compartments or cutouts*, so Kostick could not have seen the drugs where he said he did.  It is a physical impossibility.  Therefore, we previously found that Kostick's testimony, the Government's sole evidence regarding the reasonableness of the October 7th search, lacked credibility.  We suppressed the direct fruits of Kostick's search accordingly.  (See Doc. No. 41).  Now we must decide whether to exclude the fruits of the consensual December 21st search as tainted by the prior Fourth Amendment violation.  We conclude that suppression is necessary because the police misconduct here, i.e., a search justified by a manufactured sequence of events, and the resultant deliberately false testimony before this Court, is extreme.  This is precisely the type of conduct the Fourth Amendment and associated exclusionary rule aim to deter.

II.      Factual Background

      A.      The October 7th Search

In the evening of October 7, 2010,  Philadelphia Police Officer Daniel Kostick and his

partner were out on patrol.[1]  At about 8:15 PM, the officers stopped an "older Dodge Caravan,"

later identified as a 1994 Dodge Caravan owned by James Roberts, the defendant in this case.

(Tr. 8-9; 100-01; G-2).[2]  According to Kostick, he and his partner pulled-over the vehicle

because the window tint "was so dark that you could not see any occupants inside."  (Tr. 9:8-24;

22:10-16).  After the Caravan came to a stop, Kostick exited his patrol car and noticed that the

"van was shaking a lot."  (Tr. 10:13-24).  Kostick approached from the van's passenger side and

yelled "for the driver to roll down the front two windows."  (Tr. 11:6-10).  The driver and sole

occupant, James Roberts, complied, rolling down the windows and producing a driver's license.

(Tr. 11-12).

Under Kostick's version of events, Roberts kept dropping his right hand towards his

waistband instead of resting his hands on the steering wheel or his lap as Kostick had instructed.

(Tr. 12:8-13:19).  Since Roberts would not comply with Kostick's commands, Kostick went

around to the driver's side to remove Roberts from the vehicle.  (Tr. 13:16-19).  According to

Kostick:

> My partner slowly opened the driver's side vehicle door.  I had my flashlight in
> my left hand.  And while looking down, I noticed small -- two plastic bags with
> smaller packets inside which I believed to be paraphernalia.

(Tr. 14:9-12).  More specifically, Kostick testified before this Court that the bags "were in a

cutout on the door panel . . . towards the bottom half of the door."  (Tr. 15:14-20; 90:5-15).

Kostick stated that he saw the bags "[a]s the door was moving open."  (Tr. 34:7-12).  This

---

[1]When asked how many of his traffic stops resulted in the seizure of narcotics, Kostick
replied one-in-five.  (Tr. 7:25-8:3).

[2]Tr. = Transcript of March 5, 2012 suppression hearing; G = Government Exhibit; D =
Defense Exhibit.

testimony comports with Kostick's initial incident report[3] and his testimony at the preliminary hearing.[4]

Roberts finished exiting the vehicle, and Kostick immediately handcuffed him without incident.  (Tr. 16:5-19).  After placing Roberts in the patrol car, Kostick returned to the van to get the bags he had supposedly seen in the door compartment.  From the van, Kostick recovered two (2) plastic bags containing smaller packets of crack and cocaine, as well as an amber bottle containing fifty-eight (58) Xanax pills.  (Tr. 17:15-18:1).  While bending down to grab the drugs, Kostick claims he saw a "small portion of the butt end of . . . a firearm" sticking out from under the driver's seat.  (Tr. 18:2-25; 37-39).  This testimony is somewhat inconsistent with Kostick's incident report, which reflects that Kostick recovered the firearm, a loaded Glock 26, "on the floor . . . under driver seat."  (D-2, at 3).  Kostick also searched Roberts incident to this arrest and found $1,906 in cash in his pockets.  (Tr. 19:4-8; D-2, at 3).

During the suppression hearing, the Defendant introduced into evidence several photographs of a blue Dodge Caravan, license plate number HNH-1722, taken by Sonya Roberts, James Roberts' wife.  (See Tr. 64-71; D-4; D-5).  The photographs are date stamped October 11, 2010 (four (4) days after the traffic stop in question) and December 15, 2010 (two (2) days after the preliminary hearing).  (Tr. 65-71; D-4; D-5).  The license plate number in the photographs matches that of the vehicle Roberts was driving when Kostick pulled him over. (See D-1). According to Sonya Roberts, she took the October 11th pictures to show that Roberts'

---

[3]See D-2, at 1 ("[W]hen defendant opened the driver side door police observed 2 small plastic sandwhich [sic] bags containing smaller plastic ziplock packets containing white powder / white chunky substance.").

[4]Tr. 93:16-95:24.

4

van did not have illegally tinted windows.  (Tr. 66:7-25).  Similarly, Sonya Roberts testified that

she took the December 15th pictures because:

> After the preliminary hearing, my husband told me that the officer had made a
> statement stating that there was [sic] drugs found on the door pocket on the
> bottom of the door, so I took pictures to show that there was no pocket on the
> bottom door. The door is all panel.

(Tr. 68:8-14).

We have reviewed the photographs in D-4 and D-5 and conclude that (1) they do, in fact,

depict the 1994 Dodge Caravan driven by James Roberts and stopped by Officer Kostick on

October 7, 2010, and (2) the photographs show interior door panels without any compartments,

cutouts, or cubbyholes.[5]  As such, the photographs completely and undeniably undermine a

critical aspect of Kostick's testimony, namely his contention that he observed the "drug

paraphernalia" in the door cutout as Roberts was exiting his vehicle.  All of Kostick's subsequent

conduct and discoveries, i.e., his arrest of Roberts and recovery of the drugs and gun, flow

immediately and directly from his alleged plain view observation of the drugs in the door.  Since

there was no door compartment, and Kostick's testimony is a physical impossibility, we cannot

accept as true anything he said.[6]  The Government recognized as much, acknowledging that if we

---

[5]At the suppression hearing, the Government conceded that the photographs in D-4 depict
the vehicle in which Roberts was stopped on October 7, 2010.  (Tr. 146:18-147:10).  While the
Government does not make a similar concession with respect to the photographs in D-5, we are
satisfied that all the photographs depict the same vehicle.  For example, the photographs in D-4
and D-5 both show a blue Dodge Caravan having the same idiosyncratic details, e.g., pink
pinstriping and yellow paint imperfections.  In any event, the photographs in *both* D-4 and D-5
depict interior door panels without any compartments or cutouts.

[6]We do not fault Government's counsel for Kostick's untruthful testimony.  Defense
counsel did not provide the Government with copies of the photographs until the day of the
suppression hearing, so the Government had no way of knowing in advance what the
photographs would show.  (Tr. 164:1-14).

believed the photos to be true and accurate, we "would have to make a determination that Officer Kostick completely fabricated what happened during the stop." (Tr. 159:13-19; 164:8-14).

To make some sense of the photographs, the Government re-called Officer Kostick. Unfortunately, Kostick's testimony once confronted with the photographs did not fill us with confidence. Instead, Kostick equivocated as to whether the photos actually depict the van at issue:

> Q.    Directing your attention to the first page of D-5, the photograph in the top half of the page.
>
> A.    Yes.
>
> Q.    It appears to be a -- an open door?
>
> A.    Yes.
>
> Q.    Does that look like the door of the van that you stopped on October 7th?
>
> A.    No.
>
> Q.    And what's different about it?
>
> A.    From what I recollect, there was a cutout on the bottom portion. It would actually be lower than the bottom of the door handle. There was a cutout right there.
>
> . . .
>
> Q.    In this photograph, there appears to be absolutely no pocket or place for anything to be stored on the -- on this door anyway?
>
> A.    No.
>
> Q.    Was the door of the van in the stop in this condition on that night?
>
> A.    *I cannot recall.*
>
> Q.    Well, did it look like the photograph of -- on D-5; the top photograph?
>
> A.    *I cannot recall at this time.*

6

Q.     Well, you said there was a pocket or a cubby hole there, right?

A.     Yes.

Q.     Do you see one on this picture?

A.     No.

(Tr. 89:22-91:5) (emphasis added).

At bottom, we simply do not believe Officer Kostick's account of what happened on October 7th.

    B.    <u>The December 21st Search</u>

Approximately two (2) months after Kostick searched Roberts' van, federal authorities adopted the case.  On December 21, 2010, DEA Special Agent Patrick Trainor, relying exclusively on the information provided by Kostick,[7] sought and obtained an arrest warrant for James Roberts from U.S. Magistrate Judge L. Felipe Restrepo.  (<u>See</u> <u>United States v. Roberts</u>, 2:10-mj-1904 (Dec. 21, 2010), at Doc. No. 1; Tr. 49:2-50:8).  That same day, approximately ten (10) agents and officers executed the warrant, arresting Roberts in front of his house.  (Tr. 44:19-22; 56:11-14).  At the time of his arrest, Roberts had a young child with him.  (Tr. 45:1-5).  However, Roberts was "cooperative," not "belligerent or nervous or angry."  (Tr. 45:15-18; 53:24-54:5).

During his arrest, Roberts consented, first verbally and then in writing, to the search of his green minivan parked outside the house.  (Tr. 54:14-56:1; G-1).  According to Detective Francis Kerrigan, one of the agents present at the time, Agent Trainor explained the charges to

---

[7]Other than Kostick's account of the October 7th traffic stop, the only additional information contained in Trainor's affidavit concerned Roberts' prior felony conviction.  (<u>See</u> <u>United States v. Roberts</u>, 2:10-mj-1904 (Dec. 21, 2010), at Doc. No. 1 ¶ 13).

Roberts and requested his consent to search the van, which Roberts gave.  (Tr. 53:8-16).

Kerrigan described Roberts as "calm" but concerned about his child.  (Tr. 53:17-22).  Although

the officers were all armed, none had their weapons drawn at the time of Roberts' consent.  (Tr.

54:6-13; 57:15-17; 58:12-21).  The "Consent to Search" form Roberts signed authorized the

agents to search his "1996 Green Minivan, PA TAG: HML-3536" and indicated that Roberts

freely gave his consent and was neither threatened nor forced in any way.  (See G-1; Tr. 62:13-

63:4).[8]  In Kerrigan's opinion, Roberts understood the form.  (Tr. 55:12-16).  Having obtained

Roberts' consent, agents searched the vehicle and found baggies of cocaine and crack in the

center console.  (Tr. 46:5-48:5).

As mentioned *supra*, Officer Kostick's unconstitutional vehicle search on October 7th

supplied the sole basis for the December 21st arrest warrant.  However, we stress that nothing in

the record suggests that anyone involved in the December 21st arrest and consensual search

knew about the illegality of the prior search.  Indeed, the Defendant does not challenge the

sufficiency of the arrest warrant on its face and does not question the conduct of either Agent

Trainor, who applied for the warrant, or Judge Restrepo, who issued it.

III.   Legal Analysis

The Fourth Amendment protects "against unreasonable searches and seizures."  Faced

with a motion to suppress, the Government bears the burden of demonstrating the reasonableness

of a warrantless search or seizure.  United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).

Here, the Government relied only on the testimony of Officer Kostick to meet its burden as to

---

[8]Although the "Consent to Search" form notes that the minivan is a 1996 model, Pennsylvania Department of Transportation records reflect that the vehicle is, in fact, a 1997. (See G-2).

the October 7th search of Roberts and his van.  As discussed *supra*, we do not believe Kostick's

story.  The objective physical facts, which are not subject to the biases of humans, prove his

testimony to be false.  We find his entire sequence of events (excessively tinted windows –>

traffic stop –> failure to comply with commands –> drugs in plain view on the door –> gun in

plain view on the floor) a fabrication, carefully constructed to stay just within the constraints of

the Fourth Amendment.  As such, the Government has not demonstrated the reasonableness of

the October 7, 2010 traffic stop and subsequent search.  This stop and search violated James

Roberts' Fourth Amendment rights, and we have suppressed the evidence recovered during that

search accordingly.  (See Doc. No. 41).

Now we must tackle the difficult question of whether this Fourth Amendment violation

taints the fruits of the December 21st search to which Roberts consented.  Roberts contends it

does, while the Government argues that time and intervening events have purged the taint.

Because of the flagrancy of the constitutional violation that occurred here, we must agree with

Roberts.  Time cannot heal all wounds, and it cannot heal this one.

Not all Fourth Amendment violations warrant the suppression of evidence.  The

Amendment itself says nothing about suppression; rather, the exclusionary rule is a "prudential"

doctrine with a singular purpose -- to deter future Fourth Amendment violations.  Davis v.

United States, 131 S. Ct. 2419, 2426 (2011) (citation omitted).  And as the Supreme Court

recently reiterated, "real deterrent value" is a necessary, but not sufficient, condition for

exclusion.  Id. at 2427.  Instead, we balance the hard-to-quantify social costs of exclusion

(suppressing the truth) against its benefits (deterring police misconduct) and exclude the

challenged evidence only when the latter outweighs the former.  See id. at 2427-28 (cautioning

that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'") (citation omitted).  Since we, as a society, have a compelling interest in deterring flagrant police misconduct, the more egregious the violation, the more likely it justifies exclusion.  See id. (recognizing that "the deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue.").  Importantly, our exclusionary rule analysis must account for the conduct of *all* the officers involved.  See Herring v. United States, 555 U.S. 135, 140 (2009) (" In analyzing the applicability of the [exclusionary] rule, Leon admonished that we must consider the actions of all the police officers involved.").

The "purging the taint" or "attenuation" doctrine represents one (of the many) specific applications of general exclusionary rule principles.  In essence, "[t]he notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." Brown v. Illinois, 422 U.S. 590, 609 (1975) (Powell, J., concurring in part).  This tipping point depends heavily on the facts of the matter at hand.  See United States v. Fox, 600 F.3d 1253, 1260 (10th Cir. 2010) (acknowledging that the "analysis is fact-intensive."); United States v. Conrad, No. 10–2001, 2012 WL 833741, at *5 (7th Cir. Mar. 14, 2012) (acknowledging the "highly fact-intensive nature of the attenuation inquiry.").

The Third Circuit has made absolutely clear that "[c]onsent following an illegal seizure does not in itself purge the taint of the illegality for Fourth Amendment purposes; the government must show sufficient attenuation to causally disconnect the consent from the seizure." United States v. Mosley, 454 F.3d 249, 261 (3d Cir. 2006).  Several factors inform our

attenuation analysis, including (1) whether <u>Miranda</u> warnings were given, (2) the temporal proximity of the constitutional violation and the subsequent consent, (3) the presence or absence of intervening circumstances, and (4) particularly, the purpose and flagrancy of the official misconduct.  <u>Brown</u>, 422 U.S. at 603-04; <u>United States v. Luna</u>, 76 Fed. App'x 411, 414 (3d Cir. 2003) (applying <u>Brown</u> factors in tainted consent analysis).  Of course, since the attenuation inquiry involves balancing the benefits and costs of exclusion, "[n]o single fact is dispositive." <u>Brown</u>, 422 U.S. at 603.  However, "the purpose and flagrancy of the official misconduct . . . is considered the most important [factor] because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct."  <u>United States v. Reed</u>, 349 F.3d 457, 464-65 (7th Cir. 2003) (citations omitted). Finally, to avoid suppression, the Government bears the burden of proving attenuation by a preponderance of the evidence.  <u>Brown</u>, 422 U.S. at 604; <u>Kaupp v. Texas</u>, 538 U.S. 626, 632-33 (2003); <u>United States v. Pelullo</u>, 173 F.3d 131, 137-38 (3d Cir. 1999).

We now turn to the facts of this case.  Before reaching the question of attenuation, we must first ascertain whether Roberts' consent was voluntary.  <u>See</u> <u>United States v. Butts</u>, 704 F.2d 701, 705 (3d Cir. 1983) (observing that "a finding of voluntariness 'is merely a threshold requirement for the Fourth Amendment analysis.'") (citation omitted).  To do so, we look at the totality of the circumstances, considering variables such as "the setting in which the consent was obtained, the parties' verbal and non-verbal actions, and the age, intelligence, and educational background of the consenting individual."  <u>United States v. Givan</u>, 320 F.3d 452, 459 (3d Cir. 2003) (citation omitted).

Here, we have no difficulty finding that Roberts voluntarily consented to the December

21st vehicle search.  According to the agents' testimony, which we credit, Roberts was calm and cooperative at the time he gave consent.  He consented outside his own house, not at a police station after prolonged interrogation.  He consented both verbally and in writing, and he understood the consent form that he signed.  Finally, none of the officers had their weapons drawn at the time Roberts consented.  Based on the totality of the circumstances, which do not reflect an atmosphere of coercion, we conclude that Roberts consented to the vehicle search knowingly, voluntarily, and of his own free will.

We come now to the heart of the matter, attenuation.  First, the parties disagree about whether Roberts was Mirandized before he consented.  (Compare Doc. No. 45, at 11 (Roberts was given "full Miranda warnings" prior to his consent), with Doc. No 46, at 16 (Roberts "was neither warned of his Miranda rights nor permitted to consult with an attorney" before he consented)).  We have reviewed the record, and it is silent on this issue.  Neither party introduced any evidence, testimonial or otherwise, regarding Miranda warnings.  Therefore, this factor neither supports nor cuts against exclusion.

Second, regarding the "temporal proximity" and "intervening circumstances" prongs of the attenuation test, the parties disagree on the proper starting point from which to measure.  The Government measures from October 7, 2010, the date of Officer Kostick's constitutionally-offensive search.  (See Doc. No. 45, at 8-11).  In this scenario, over two (2) months passed between the illegality and Roberts' later consent, which weakens the link between the violation and consent.  On the other hand, the Defendant measures from the December 21st arrest pursuant to a warrant based on Agent Trainor's affidavit incorporating Kostick's fabricated account of the October 7th search.  (See Doc. No. 46, at 15-17).  Through this lens, mere minutes separated "the

initiation of the illegal arrest and the obtaining of the consent," which would weigh against a finding of attenuation.  (Id. at 15).  Neither the Government nor the Defendant sought to justify its preferred temporal measuring stick.

On this particular point, we agree with the Government.  As discussed *supra*, the point of the exclusionary rule is to deter police misconduct.  The attenuation factors, including "temporal proximity" and "intervening circumstances," are really just clues that help us determine whether the benefits of suppressing certain evidence outweigh the costs.  Here, the conduct we wish to deter is Officer Kostick's, not that of the agents who ultimately arrested Roberts on December 21st.  Therefore, our purging-the-taint inquiry must center on the events of October 7th.  The Defendant implicitly recognizes this, focusing entirely on Officer Kostick's conduct in discussing the "purpose and flagrancy" prong of the attenuation analysis.  (See Doc. No. 46, at 17-18).

Using October 7th as the starting point, the "temporal proximity" and "intervening circumstances" attenuation factors weigh against suppressing the fruits of the consensual December 21st search, but only slightly.  As the Government points out, over two (2) months elapsed between Officer Kostick's search and Roberts' consent.  Apparently, Roberts was not in police custody during this time.[9]  In addition, the agents who obtained Roberts' consent are different from the officer who committed the earlier illegality.  All of this distances the December 21st search from the October 7th violation.

But we cannot ignore the fact that the fruits of the unconstitutional October 7th search

---

[9]The Government made this assertion without citing evidence for support.  (Doc. No. 45, at 8).  However, at the very least, Roberts was not in police custody on December 21st since federal agents arrested him at his home.

13

provided the sole basis for the December 21st arrest warrant.  In this case, there is a direct link from Fourth Amendment violation to arrest to consent.  Therefore, by excluding the fruits of the December 21st search, we can reasonably expect to deter the initial (and, as discussed below, flagrant) police misconduct, even though it took place over two (2) months prior to Roberts' consent and before federal authorities adopted the case.  Cf. Wayne R. LaFave et al., 3 Crim. Proc. § 9.3(c) (3d ed. 2007) (noting the impropriety of exclusion when "the chain between the challenged evidence and the primary illegality is long" because "the threat of exclusion could not possibly operate as a deterrent.").

Finally, we come to the most important consideration in our analysis, the purpose and flagrancy of the official misconduct.  We need not say much.  Based on the evidence before us, we have no choice but to conclude that Officer Kostick fabricated a story to justify an illegal search and then told that story in open court.  This is exactly the type of egregious misbehavior we hope to deter through the exclusionary rule.  In the final balance, we conclude that the social costs of excluding the fruits of the December 21st search are high (as they typically are), but the deterrence value of exclusion is higher.

The Government cites many cases to support the proposition that courts "consistently find[] attenuation where there has been an intervening delay of days or longer and the later consent is otherwise voluntary."  (Doc. No. 45, at 9).  Maybe so, but the constitutional violations in the Government's cited cases pale in comparison to the violation here.  See, e.g., United States v. Schettler, 32 Fed. App'x 14, 15-16 (3d Cir. 2002) (district court described seizure as "technical" in nature); Pennsylvania ex rel. Craig v. Maroney, 348 F.2d 22, 28-29 (3d Cir. 1965) (assuming, without deciding, that the initial arrest was illegal for purposes of attenuation

14

analysis); United States v. West, 453 F.2d 1351, 1357 (3d Cir. 1972) (third party could consent

to search of his own car, and defendant did not argue that consent was coerced); United States v.

Lopez-Garcia, 565 F.3d 1306, 1316 (11th Cir. 2009) (no indication of any flagrant behavior by

anyone involved in defendant's arrest and interrogation); United States v. Shi, 525 F.3d 709, 727

(9th Cir. 2008) (defendant's "unwarned statements were not the product of purposeful or flagrant

official misconduct."); United States v. Stark, 499 F.3d 72, 76 (1st Cir. 2007) (the "initial search

and seizure was not an egregious violation of the Fourth Amendment."); United States v. Snype,

441 F.3d 119, 135 (2d Cir. 2006) (purpose of illegal entry into third party's apartment, i.e., to

arrest defendant for violent robbery, was legitimate); United States v. Perry, 437 F.3d 782, 785-

86 (8th Cir. 2006) (illegal vehicle search in curtilage of residence and no misconduct on officer's

part); United States v. Martin, 431 F.3d 846, 850 (5th Cir. 2005) (finding "no indication of

purposefulness here."); United States v. Gale, 952 F.2d 1412, 1418 (D.C. Cir. 1992) (officer

"asked only one improper question.").

        As discussed above, the flagrancy of the misconduct plays a paramount role in the

attenuation equation.  The worse the violation, the greater the need for deterrence.  Thus, when

faced with a severe Fourth Amendment violation, courts almost invariably refuse to find

attenuation.  See, e.g., United States v. Rivera-Padilla, 365 Fed. App'x 343, 347 (3d Cir. 2010)

(no attenuation, in part because the misconduct "was serious indeed."); United States v.

Robeles-Ortega, 348 F.3d 679, 684-85 (7th Cir. 2003) (no attenuation, in part because "the

officers literally broke down the door, without exigent circumstances and without a warrant, and

at least five agents rushed into the apartment with guns."); United States v. Beauchamp, 659

F.3d 560, 574 (6th Cir. 2011) (no attenuation, in part because the purpose of the stop seemed to

15

be "investigatory"); United States v. Washington, 387 F.3d 1060, 1075-76 (9th Cir. 2004) (no attenuation, in part because officer repeatedly reminded defendant that he could be arrested at any time in order to coerce defendant's consent); United States v. Fox, 600 F.3d 1253, 1262 (10th Cir. 2010) (no attenuation, in part because officer embarked on fishing expedition); United States v. Macias, 658 F.3d 509, 524 (5th Cir. 2011) (no attenuation, in part because the "purpose of the continuing detention was to obtain consent to search the vehicle for the possibility of finding contraband of any sort.").

We do not mean to suggest that every serious Fourth Amendment violation triggers the exclusionary rule, no matter how remote the link between the misconduct and the resulting evidence. Perhaps that was once the law. See Rawlings v. Kentucky, 448 U.S. 98, 110 (1980) (suggesting that "conscious or flagrant misconduct" requires "prophylactic exclusion" of the tainted fruits). Now, the Supreme Court's jurisprudence mandates a more restrained approach to exclusion. See Davis, 131 S. Ct. at 2426-27. But even under the current cost v. benefit rubric, suppression is necessary here. The underlying Fourth Amendment violation is deeply troubling, and that violation led directly (although not immediately) to the December 21st arrest during which Roberts consented to the vehicle search in question. Under the circumstances, we believe the deterrence benefits of suppression outweigh the social costs. As a result, we (and society) must swallow the "bitter pill" of exclusion in this matter. Id. at 2427.

IV.    <u>Conclusion</u>

For the aforementioned reasons, Defendant's Motion to Suppress (Doc. No. 22) is

GRANTED in its entirety.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.